# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON YELLIN, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>    v.<br><br>NORDIC NATURALS, INC.<br><br>           Defendant. | Case No.:  7:23-cv-10681-CS<br>Case Filed: December 7, 2023<br>FAC Filed: January 19, 2024<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>  1. Violation of New York Consumer Fraud Act (N.Y. GBL §§ 349, *et seq.*)<br>  2. Violation of New York Consumer Fraud Act (N.Y. GBL §§ 350, *et seq.*)<br>  3. Breach of Warranty<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page No.**

COMPLAINT ...................................................................................................................1

I.      INTRODUCTION ....................................................................................................1

II.     JURISDICTION ....................................................................................................13

III.    VENUE ...................................................................................................................13

IV.     PARTIES ................................................................................................................13

        A.      Plaintiff ......................................................................................................13

        B.      Defendant ...................................................................................................14

V.      FACTUAL ALLEGATIONS .................................................................................15

        A.      Market and Regulatory Background ..........................................................15

        B.      Products' Labeling .....................................................................................17

        C.      Falsity of the Challenged Representations .................................................19

        D.      Defendant's Brand Strategy and Long-Standing Marketing Campaign .............27

        E.      Competitor Vitamin and Dietary Supplement Product Labels and Packaging ......28

        F.      Defendant Knowingly and Deliberately Misleads Plaintiff and Reasonable

                Consumers into Buying the Products to Their Detriment ...................................30

        G.      The Products' Substantial Similarity ........................................................34

VI.     CLASS ACTION ALLEGATIONS .......................................................................35

VII.    CAUSES OF ACTION ..........................................................................................37

                COUNT ONE ...............................................................................................37

                COUNT TWO ..............................................................................................39

PRAYER FOR RELIEF ......................................................................................................43

DEMAND FOR JURY TRIAL ...........................................................................................45

FIRST AMENDED CLASS ACTION COMPLAINT

<u>**COMPLAINT**</u>

1.       Plaintiff Jason Yellin ("**Plaintiff**"), individually and on behalf of all others similarly situated, as more fully described herein (the "**Class**" and/or "**Class Members**"), brings this class action against Defendant Nordic Naturals, Inc. ("**Defendant**" and/or "**Nordic Naturals**"), and alleges the following based upon information and belief, unless otherwise expressly stated as based upon personal knowledge.

## I.    <u>INTRODUCTION</u>

2.       **Synopsis.** In an effort to increase profits and to obtain an unfair advantage over its lawfully acting competitors, Defendant deceptively labels certain of its Nordic Naturals® vitamin and dietary supplement products by misrepresenting the dosage amount of each capsule, tablet or gummy. *See*, *infra*, ¶ 4 (identifying each vitamin and dietary supplement, which are collectively referred to herein as the "**Products**"). Specifically, the front label and/or packaging of each Product prominently advertises the dosage amount, for example "500 mg Omega 3" ("**Dosage Representation**"), and the number of tablets, capsules, or gummies included in each Product, for example "60 Soft Gels" ("**Unit Representation**"). However, labeling the Products in this way misleads reasonable consumers into believing that each tablet, capsule, or gummy contains the advertised dosage, for example "60 Soft Gels" each containing "500 mg Omega 3" (hereinafter, "**Dosage Per Unit Representation**" and/or "**Challenged Representations**"). *See* **Exhibit 1** [Product Images]. In actuality, to achieve the advertised dosage, consumers must ingest multiple tablets, capsules or gummies, because each one contains only a fraction of the advertised dosage. This causes consumers to grossly overpay for the Products since they are receiving half (and oftentimes less than half) of the advertised value but paying the entire purchase price. *See* **Exhibit 3** [Serving Size Chart]. Therefore, the Challenged Representations are false and deceptive because they cause reasonable consumers to believe the Products contain two or more times the amount of vitamins, nutrients, or dietary supplements than they actually contain. Exemplars of the Products' labels and packaging are depicted below.

/ / /

/ / /

(1)    Nordic Naturals Algae DHA (60 Count) (**Exhibit 1-1**):



(*see also* Nordic Naturals *Algae*, **Exhibit 1-1 to 1-5**);

(2)    Nordic Naturals Children's DHA (90 Count) (**Exhibit 1-6**):



(*see also* Nordic Naturals *Children's*, **Exhibit 1-6 to 1-11**);

FIRST AMENDED CLASS ACTION COMPLAINT

(3) Nordic Naturals Complete Omega (60 Count) (**Exhibit 1-12**):



(*see also* Nordic Naturals *Complete Omega*, **Exhibit 1-12** to **1-20**);

(4) Nordic Naturals Kids Flora Probiotic Gummies (60 Count) (**Exhibit 1-21**)



(*see also* Nordic Naturals *Flora Probiotic*, **Exhibit 1-21** to **1-23**);

FIRST AMENDED CLASS ACTION COMPLAINT

(5) Nordic Naturals Omega Blood Sugar (60 Count) (**Exhibit 1-37**):



(*see also* Nordic Naturals *Omega-3*, **Exhibit 1-24** to **1-53**);

(6) Nordic Naturals Postnatal Omega-3 (60 Count) (**Exhibit 1-54**):



(*see also* Nordic Naturals *Postnatal and Prenatal Care*, **Exhibit 1-54** to **1-59**);

-4-

(7) Nordic Naturals Vitamin C Gummies (60 Count) (**Exhibit 1-61**):



(*see also* Nordic Naturals *Vitamin C*, **Exhibit 1-60** to **1-63**);

(8) Nordic Naturals Ultimate Omega (60 Count) (**Exhibit 1-64**):



(*see also* Nordic Naturals *Ultimate*, **Exhibit 1-64** to **1-85**);

FIRST AMENDED CLASS ACTION COMPLAINT

(9) Nordic Naturals Zero Sugar Curcumin Gummies (60 Count) (**Exhibit 1-86**):



(*see also* Nordic Naturals *Zero Sugar*, **Exhibit 1-86** to **1-87**);

(10)    Nordic Naturals ProOmega 2000-D (60 count) (**Exhibit 1-101**):



(*see also* Nordic Naturals *Pro*, **Exhibit 1-88** to **Exhibit 1-113**); and



(11)    Nordic Naturals Magnesium Complex (90 Count) **(Exhibit 1-114)**




(*see also* Nordic Naturals *Magnesium*, **Exhibit 1-114** to **Exhibit 1-115**).

3.    **The Challenged Representations Are Deceptive.** The Challenged Representations mislead reasonable consumers into believing that each tablet, capsule, or gummy unit contains the advertised dosage of nutrients. However, contrary to the labeling, each unit only contains a fraction of the advertised nutrients. Consequently, reasonable consumers believe that they are receiving two or more times the amount of nutrients per Product than what they are actually receiving. As a result, Defendant has charged consumers a premium for the Products, while cutting costs and reaping the financial benefits of selling dietary supplements and vitamins with less than the advertised dosage of nutrients in each Product. By comparison, Defendant's competitors typically advertise the actual amount of nutrients per tablet, capsule, or gummy on the front label and packaging of their vitamin and dietary supplement products. Therefore, by falsely, misleadingly, and deceptively labeling and advertising the Products, Defendant sought an unfair advantage over its lawfully acting competitors. Accordingly, the Challenged Representations are misleading and deceptive, and therefore unlawful.

4.    **Products.** The Products at issue are Nordic Naturals® brand vitamins and dietary

supplements that contain: (1) a Dosage Representation and Unit Representation on the Products' front label and/or packaging; and (2) according to the back-label suggested-use, serving size, and supplement facts require consumption of two or more units to obtain the advertised dosage of nutrients (hereinafter, the "**Products**"). The Products include, but are not necessarily limited to, the following product lines and products, in any size, count, or variation:

    a.  **(1) Nordic Naturals *Algae***, in all size variations, flavors or packing types, including:

      1.  Algae DHA, in all sizes, including (a) 60 Count and (b) 90 Count (*see* **Exhibit 1-1 to Exhibit 1-2**);
      2.  Algae Omega, in all sizes, including (a) 60 Count, (b) 90 Count, and (c) 120 Count (*see* **Exhibit 1-3 to Exhibit 1-5**);

(*see* **Exhibit 1-1** to **1-5** [Product Images Nordic Naturals *Algae* Vitamins and Dietary Supplements]);

    b.  **(2) Nordic Naturals *Children's***, in all size variations, flavors, or packing types, including:

      3.  Children's DHA, in all sizes, including (a) 90 Count, (b) 120 Count, (c) 180 Count, and (d) 360 Count (*see* **Exhibit 1-6 to Exhibit 1-9**);
      4.  Children's DHA Vegetarian, in all sizes, including (a) 120 Count (*see* **Exhibit 1-10**);
      5.  Children's DHA Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-11**);

(*see* **Exhibit 1-6** to **1-11** [Product Images Nordic Naturals *Children's* Vitamins and Dietary Supplements]);

    c.  **(3) Nordic Naturals *Complete***, in all size variations, flavors, or packaging types, including:

      6.  Complete Omega, in all sizes, including (a) 60 Count, (b) 120 Count, and (c) 180 Count (*see* **Exhibit 1-12 to Exhibit 1-14**);
      7.  Complete Omega Junior, in all sizes, including (a) 90 Count and (b) 180 Count (*see* **Exhibit 1-15 to Exhibit 1-16**);
      8.  Complete Omega Xtra, in all sizes, including (a) 60 Count (*see* **Exhibit 1-17**);
      9.  Complete Omega-D3, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-18 to Exhibit 1-19**);
     10.  Complete Omega-D3 Junior, in all sizes, including (a) 90 Count (*see* **Exhibit 1-20**);

(*see* **Exhibit 1-12 to 1-20** [Product Images Nordic Naturals *Complete* Vitamins and

Dietary Supplements]);

d. **(4) Nordic Naturals *Flora Probiotic***, in all size variations, flavors, or packaging types, including:

    11.    Kids Nordic Flora Probiotic Gummies with Prebiotics, in all sizes, including (a) 60 Count (*see* **Exhibit 1-21**);
    12.    Nordic Flora Probiotic Daily, in all sizes, including (a) 60 Count (*see* **Exhibit 1-22**);
    13.    Nordic Flora Probiotic Woman, in all sizes, including (a) 60 Count (*see* **Exhibit 1-23**);

(*see* **Exhibit 1-21** to **1-23** [Product Images for Nordic Naturals *Nordic Flora* Vitamins and Dietary Supplements]);

e. **(5) Nordic Naturals *Omega-3***, in all size variations, flavors, or packaging types, including:

    14.    Arctic Cod Liver Oil, in all sizes, including (a) 90 Count and (b) 180 Count (*see* **Exhibit 1-24** to **Exhibit 1-25**);
    15.    Arctic Omega, in all sizes, including (a) 180 Count (*see* **Exhibit 1-26**);
    16.    Balanced Omega, in all sizes, including (a) 180 Count (*see* **Exhibit 1-27**);
    17.    Curcumin Gummies, in all sizes, including (a) 60 Count (*see* **Exhibit 1-28**);
    18.    DHA, in all sizes, including (a) 90 Count (*see* **Exhibit 1-29**);
    19.    DHA Jr. Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-30**);
    20.    DHA Junior, in all sizes, including (a) 180 Count (*see* **Exhibit 1-31**);
    21.    DHA Xtra, in all sizes, including (a) 60 Count and (b) 90 Count (*see* **Exhibit 1-32** to **Exhibit 1-33**);
    22.    EPA, in all sizes, including (a) 60 Count (*see* **Exhibit 1-34**);
    23.    EPA Xtra, in all sizes, including (a) 60 Count and (b) 90 Count (*see* **Exhibit 1-35** to **Exhibit 1-36**);
    24.    Omega Blood Sugar, in all sizes, including (a) 60 Count (*see* **Exhibit 1-37**);
    25.    Omega Curcumin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-38**);
    26.    Omega Focus, in all sizes, including (a) 60 Count (*see* **Exhibit 1-39**);
    27.    Omega Joint Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-40**);
    28.    Omega LDL, in all sizes, including (a) 60 Count (*see* **1-41**);
    29.    Omega Memory with Curcumin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-42**);
    30.    Omega Vision, in all sizes, including (a) 60 Count (*see* **Exhibit 1-43**);
    31.    Omega Woman with Evening Primrose Oil, in all sizes, including (a) 120 Count (*see* **Exhibit 1-44**);
    32.    Omega-3, in all sizes, including (a) 60 Count, (b) 90 Count, (c) 120 Count, and (d) 180 Count (*see* **Exhibit 1-45** to **Exhibit 1-48**);
    33.    Omega-3 Phospholipids, in all sizes, including (a) 60 Count (*see* **Exhibit 1-49**);
    34.    Omega-3D, in all sizes, including (a) 60 Count (*see* **Exhibit 1-50**);
    35.    Omega-3 Gummies, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-51** to **Exhibit 1-52**);
    36.    Recovery Plus, in all sizes, including (a) 45 Count (*see* **Exhibit 1-53**);

(*see* **Exhibit 1-24** to **Exhibit 1-53** [Product Images for Nordic Naturals *Omega-3* Vitamins and Dietary Supplements]);

f.  **(6) Nordic Naturals *Postnatal and Prenatal Care***, in all size variations, flavors, or packaging types, including:

37.  Postnatal Omega-3, in all sizes, including (a) 60 Count (*see* **Exhibit 1-54**);
38.  Prenatal DHA, in all sizes, including (a) 90 Count, (b) 120 Count, and (c) 180 Count (*see* **Exhibit 1-55** to **Exhibit 1-58**);
39.  Vegan Prenatal DHA, in all sizes, including (a) 60 Count (*see* **Exhibit 1-59**);

(*see* **Exhibit 1-54** to **Exhibit 1-59** [Product Image for Nordic Naturals *Postnatal and Prenatal Care* Vitamins and Dietary Supplements]);

g.  **(7) Nordic Naturals *Vitamin C***, in all size variations, flavors, or packaging types, including:

40.  Immune Daily Defense, in all sizes, including (a) 90 Count (*see* **Exhibit 1-60**);
41.  Vitamin C Gummies, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-61** to **Exhibit 1-62**);
42.  Vitamin C Gummies Sports, in all sizes, including (a) 120 Count (*see* **Exhibit 1-63**);

(*see* **Exhibit 1-60** to **Exhibit 1-63** [Product Images for *Vitamin C* Vitamins and Dietary Supplements]);

h.  **(8) Nordic Naturals *Ultimate***, in all size variations, flavors, or packaging types, including:

43.  Ultimate Omega, in all sizes, including (a) 60 Count, (b) 90 Count, (c) 120 Count, (d) 180 Count, and (e) 210 Count (*see* **Exhibit 1-64** to **Exhibit 1-68**);
44.  Ultimate Omega Gummy Chews, in all sizes, including (a) 54 Count (*see* **Exhibit 1-69**);
45.  Ultimate Omega + Coq10, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-70** to **Exhibit 1-71**);
46.  Ultimate Omega in Fish Gelatin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-72**);
47.  Ultimate Omega Junior, in all sizes, including (a) 90 Count and (b) 120 Count (*see* **Exhibit 1-73** to **Exhibit 1-74**);
48.  Ultimate Omega Sport 2X, in all sizes, including (a) 60 Count (*see* **Exhibit 1-75**);
49.  Ultimate Omega 2x, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-76** to **Exhibit 1-77**);
50.  Ultimate Omega 2x Mini, in all sizes, including (a) 60 Count (*see* **Exhibit 1-78**);

51. Ultimate Omega 2x Mini with Vitamin D3, in all sizes, including (a) 60 Count (*see* **Exhibit 1-79**);
52. Ultimate Omega Xtra, in all sizes, including (a) 60 Count (*see* **Exhibit 1-80**);
53. Ultimate Omega-D3, in all sizes, including (a) 60 Count, (b) 90 Count, and (c)120 Count (*see* **Exhibit 1-81** to **Exhibit 1-83**);
54. Ultimate Omega-D3 Sport, in all sizes, including (a) 60 Count (*see* **Exhibit 1-84**);
55. Omega-D3 2x, in all sizes, including (a) 60 Count (*see* **Exhibit 1-85**);

(*see* **Exhibit 1-64** to **Exhibit 1-85** [Product Images for Nordic Naturals *Ultimate* Vitamins and Dietary Supplements]);

i.   **(9) Nordic Naturals *Zero Sugar***, in all size variations, flavors, or packaging types, including:

56. Zero Sugar Curcumin Gummies, in all sizes, including (a) 60 Count (*see* **Exhibit 1-86**); and
57. Zero Sugar Ultimate Omega Gummy Chews, in all sizes, including (a) 54 Count (*see* **Exhibit 1-87**)

(*see* **Exhibit 1-86** to **Exhibit 1-87** [Product Images for Nordic Naturals *Zero Sugar* Vitamins and Dietary Supplements]);

j.   **(10) Nordic Naturals *Pro***, in all size variations, flavors, or packaging types, including:

58. ProDHA, in all sizes, including (a) 120 Count (*see* **Exhibit 1-88**);
59. ProDHA 1000, in all sizes, including (a) 120 Count (*see* **Exhibit 1-89**);
60. ProDHA Eye, in all sizes, including (a) 60 Count (*see* **Exhibit 1-90**);
61. ProDHA Focus Jr., in all sizes, including (a) 120 Count (*see* **Exhibit 1-91**);
62. ProDHA Memory, in all sizes, including (a) 60 Count (*see* **Exhibit 1-92**);
63. ProEFA-3-6-9, in all sizes, including (a) 90 Count, (b) 180 Count (*see* **Exhibit 1-93** to **Exhibit 1-94**);
64. ProEPA, in all sizes, including (a) 120 Count, (b) 180 Count (*see* **Exhibit 1-95** to **Exhibit 1-96**);
65. ProEPA with Concentrated GLA, in all sizes, including (a) 60 Count (*see* **Exhibit 1-97**);
66. ProEPA Xtra, in all sizes, including (a) 120 Count (*see* **Exhibit 1-98**);
67. ProOmega 2000 Jr., in all sizes, including (a) 60 Count (*see* **Exhibit 1-99**);
68. ProOmega 2000, in all sizes, including (a) 60 Count (*see* **Exhibit 1-100**);
69. ProOmega 2000-D, in all sizes, including (a) 60 Count (*see* **Exhibit 1-101**);
70. ProOmega Blood Sugar, in all sizes, including (a) 60 Count (*see* **Exhibit 1-102**);

71.  ProOmega CoQ10, in all sizes, including (a) 60 Count, (b) 120 Count (*see* **Exhibit 1-103** to **Exhibit 1-104**);

72.  ProOmega CRP, in all sizes, including (a) 90 Count (*see* **Exhibit 1-105**);

73.  ProOmega in Fish Gelatin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-106**);

74.  ProOmega Joint Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-107**);

75.  ProOmega Junior, in all sizes, including (a) 90 Count (*see* **Exhibit 1-108**);

76.  ProOmega LDL, in all sizes, including (a) 180 Count (*see* **Exhibit 1-109**);

77.  ProOmega, in all sizes, including (a) 60 Count (see **Exhibit 1-110**);

78.  ProOmega-3-6-9, in all sizes, including (a) 120 Count (*see* **Exhibit 1-111**); and

79.  ProOmega-D, in all sizes, including (a) 60 Count, (b) 180 Count (*see* **Exhibit 1-112** to **Exhibit 1-113**);

(*see* **Exhibit 1-88** to **Exhibit 1-113** [Product Images for Nordic Naturals *Pro* Vitamins and Dietary Supplements]);

k.  **(11) Nordic Naturals *Magnesium***, in all size variations, flavors, or packaging types, including:

80.  Magnesium Complex, in all sizes, including (a) 90 Count (*see* **Exhibit 1-114**); and

81.  Magnesium Gummies, in all sizes, including (a) 60 Count (*see* **Exhibit 1-115**);

(*see* **Exhibit 1-114** to **Exhibit 1-115** [Product Images for Nordic Naturals *Magnesium* Vitamins and Dietary Supplements]);

5.  **Primary Objective.**  Plaintiff brings this action, individually and in a representative capacity on behalf of those similarly situated consumers who purchased the Products during the relevant Class Period (Class defined *infra*), for the primary objective to seek on Plaintiff's own behalf and on behalf of the Class, a monetary recovery of the price premium Plaintiff and consumers overpaid for Products that should, but fail to, comport with the Challenged Representations (which may include, for example, damages, restitution, disgorgement, and/or any applicable penalties, fines, or punitive/exemplary damages) solely to the extent that the causes of action pled herein permit such recovery.

/ / /

/ / /

## II.     JURISDICTION

6.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over Defendant because it conducts substantial business within New York, including the sale, marketing, and advertising of the Products. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State, including Plaintiff's purchases.

## III.     VENUE

8.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Specifically, Plaintiff purchased the Products in this District, and Defendant has deliberately marketed, advertised, and sold the Products within this District using the Challenged Representations, as specified below.

## IV.     PARTIES

### A.     Plaintiff

9.     **Plaintiff Jason Yellin.** The allegations in this paragraph, and this paragraph alone, are alleged based upon Plaintiff Yellin's personal knowledge:

  a.   **Residence.** Plaintiff Yellin is a resident of Scarsdale, New York.

  b.   **Purchase Details.** Plaintiff Yellin purchased (a) Nordic Naturals Arctic Cod Liver Oil (*see* Exhibit 1-24); and (b) Nordic Naturals Zero Sugar Curcumin Gummies (*see* Exhibit 1-86) (collectively the "**Yellin Purchased Products**"). Plaintiff Yellin purchased the Nordic Naturals Arctic Cod Liver Oil for approximately $20.00 on Amazon in Scarsdale, New York in or around January 2023. *See* **Exhibit 1-24** (Exemplar Arctic Cod Liver Oil Image). Plaintiff Yellin purchased the Nordic Naturals Zero Sugar Curcumin Gummies for approximately $26.00 on Amazon in Scarsdale, New York in or around April 2021 and in or around May 2021. *See* **Exhibit 1-86** (Exemplar Zero Sugar Curcumin Gummies Image).

  c.   **Reliance on Challenged Representations.** In making each purchase described above, Plaintiff Yellin read the Challenged Representations on the Purchased

Products' front labels or packaging (*see id.*), which led Plaintiff to believe that each tablet, capsule, or gummy unit of the Purchased Product contained the advertised dosage of nutrients—i.e., the Nordic Naturals Arctic Cod Liver Oil contained a total of 90 Soft Gels, each of which contained 750 mg of Omega-3; and the Nordic Naturals Zero Sugar Curcumin Gummies contained a total of 60 Gummies, each of which contained 200 mg of Longvida Optimized Curcumin.

d.  **No Actual Knowledge of Falsity.** At the time of purchase, Plaintiff Yellin did not know that the Challenged Representations were false in that Plaintiff did not know that more than one tablet, capsule, or gummy unit would need to be consumed to receive the advertised dosage of nutrients—i.e., Plaintiff did not know that each tablet, capsule, or gummy unit of the Purchased Products contained only a fraction of the amount of nutrients advertised in the Dosage Representation on the Products' front labels and packaging.

e.  **No Notice of Contradictions.** Plaintiff Yellin did not notice any disclaimer, qualifier, or other explanatory statement or information on the Purchased Products' labels or packaging that contradicted the prominent Challenged Representations or otherwise suggested that each tablet, capsule, or gummy unit in the Products did not, in fact, contain the advertised amount of nutrients stated in the front-label and packaging Dosage Representation.

f.  **Causation/Damages.** Plaintiff Yellin would not have purchased the Purchased Products, or would not have paid as much for them, had Plaintiff known that the Challenged Representations were false—i.e., had Plaintiff known that each tablet, capsule, or gummy unit in the Products contained a fraction of the amount of nutrients advertised in the Dosage Representation.

g.  **Desire to Repurchase.** Plaintiff Yellin continues to see the Products available for purchase and desires to purchase them again if the Challenged Representations were in fact true—i.e., if each tablet, capsule, or gummy unit in the Products contained the amount of nutrients advertised in the Dosage Representation.

h.  **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Yellin does not personally know the methods used to make the Products, such that Plaintiff does not personally know and cannot determine, prior to purchasing the Products and without testing the Products, whether the Products contain the advertised number of tablets, capsules, or gummy units, each unit of which contains the advertised amount of nutrients in the Dosage Representation. Accordingly, Plaintiff has no way of determining whether the Challenged Representations on the front of the Products' labels and packaging are true before buying the Products.

i.  **Inability to Rely.** Plaintiff Yellin is, and continues to be, unable to rely on the truth of the Challenged Representations on the Products' labels.

**B.    Defendant**

10.    **Defendant Nordic Naturals, Inc. ("Defendant")** is headquartered and/or maintains a principal place of business in the City of Watsonville, State of California. Defendant was doing business in the State of New York at all relevant times, including the Class Period.

Directly and through its agents, Defendant has substantial contacts with and receives substantial benefits and income from and through the State of New York. Defendant is one of the owners, manufacturers, marketers, and/or distributors of the Products, and is one of the companies that created, authorized, and controlled the use of the Challenged Representations to market the Products. Defendant and its agents promoted, marketed, and sold the Products at issue throughout the State of New York, in particular, within this judicial district. The unfair, unlawful, deceptive, and misleading Challenged Representations on the Products were prepared, authorized, ratified, and/or approved by Defendant and its agents to deceive and mislead consumers in the State of New York into purchasing the Products.

## V. FACTUAL ALLEGATIONS

### A. Market and Regulatory Background

11.    **Consumer Demand for Vitamins and Dietary Supplements.** In recent years, consumers have poured billions of dollars into the vitamin and dietary supplement market.[1] Consumers value such nutrients due to their perceived health and wellness benefits and to fill any nutritional gaps in their diets.[2] In response to consumers' desire for vitamins and dietary supplements, many companies, like Defendant, have scrambled to manufacture, market, and sell purportedly "high" dosages or "more" nutrients, at the same or lower costs, in an effort to gain market share and outsell competitors. Unfortunately, rather than creating the actual "high" dosage vitamins and dietary supplements with "more" nutrients that consumers desire, Defendant makes products with lower dosages and less nutrients than is advertised on the Products' packaging and front labels, and then markets them to consumers through deceptive labeling and packaging claims (to wit, the Challenged Representations). In doing so, Defendant misleads consumers into believing that the Products contain "higher" dosages or "more" nutrients in each capsule, tablet or

---

[1] *See Vitamins and Supplements Market Size, Share & COVID-19 Impact Analysis, By Type (Multivitamins, Calcium Supplements, Pediatric Supplements, and Others), Form (Capsule, Tablet, Powder, and Liquid & Gel), Distribution Channel (Supermarkets, Convenience Stores, Specialty Stores, and Online Retails), and Regional Forecast, 2021-2028,* FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/vitamins-and-supplements-market-104051 (last accessed December 5, 2023).

[2] *See* Blatman, Dickinson, El-Dash, & Franco *Consumer Usage and Reasons for Using Dietary Supplements: Report of a Series of Surveys,* 32 J. OF THE AM. COLL. OF NUTRITION 176, 181 (Apr. 14, 2014).

gummy than what is actually contained therein.

12.    **Competitor Representations.** In contrast to how the Defendant labels its Products, Defendant's competitors correctly label and sell their products to show the correct dosage information on the front label and packaging of their products. Defendant's competitors typically do this in one of two ways. First, Defendant's competitors specify on the front label the actual amount of nutrients in each tablet, capsule, or gummy unit. For example, "120 soft gels" of "1,250 mg" of "Norwegian Cod Liver Oil" means exactly what it says: that consumers receive 120 soft gel capsules, each containing 1,250 mg of Norwegian Cod Liver Oil. *See*, *e.g.*, **Exhibit 2-1** [Competitor Product Labels]. Second, Defendant's competitors specify accurate serving-size information on the front label; that is, whether more than one tablet, capsule, or gummy unit is necessary to obtain the advertised amount of nutrients in a single serving. For example, "60 soft gels" totaling "30 servings" of "1,000 mg" of "Antarctic Krill Oil" means, exactly what says: that consumers receive 60 soft gel capsules, totaling 30 servings, with each serving being 1,000 mg of Antarctic Krill Oil. *See*, *e.g.*, **Exhibit 2-4** [Competitor Product Labels]. By comparison, Defendant specifies the dosage of nutrients and total number of units, just like the first example, except that consumers do not receive that amount of nutrients because they need to take more than one tablet, capsule, or gummy unit to obtain the advertised amount of nutrients. *See*, *e.g.*, **Exhibit 1** [Defendant's Product Labels].

13.    **FTC Guidelines.**  Recognizing the vulnerability of consumers who purchase health supplements, the United States Federal Trade Commission created the Health Products Compliance Guideline to help companies, like Defendant, avoid making misleading and deceptive claims.[3] "Under FTC law, a marketer is equally responsible for the accuracy of claims suggested or reasonably implied in advertising."[4] Moreover, "FTC law focuses not on the marketer's intent, but on the consumer's understanding."[5] Thus, the FTC warns manufacturers and marketers that

---

[3]    FTC, *Health Products Compliance Guidelines* at 1, https://www.ftc.gov/system/files/ftc_gov/pdf/Health-Guidance-508.pdf (last accessed December 5, 2023) ("this document provides guidance from FTC staff on how to ensure that the claims about benefits and safety of health-related products are truthful, not misleading, and supported by science.").
[4] *Id.* at 5.
[5] *Id.* at 5.

both express and implied claims must be truthful when viewed from the reasonable consumer's perspective, and where any such claims reasonably convey more than one meaning, all such meanings must be accurate and truthful:

> The first step in evaluating the truthfulness and accuracy of advertising and marketing materials is to identify all express and implied claims conveyed to consumers acting reasonably. Marketers must make sure that whatever they say expressly in advertising is accurate. Often, however, advertising conveys other claims beyond those expressly stated. Under FTC law, a marketer is equally responsible for the accuracy of claims suggested or reasonably implied in advertising. Marketers can't suggest benefits, safety, or other characteristics about their product indirectly that they couldn't claim directly.
>
> FTC law focuses not on the marketer's intent, but on the consumer's understanding. The determination of what claims are made in marketing is consumer-driven – in other words, what reasonable consumers understand the advertising or marketing materials to communicate about the product. When identifying the claims conveyed by an ad, marketers shouldn't focus narrowly on individual phrases or statements, but rather should consider each ad as a whole, assessing the "net impression" conveyed by all elements of the ad, including the text, product name, and any charts, graphs, and other images. When an ad lends itself to more than one reasonable interpretation, the advertiser is responsible for substantiating each interpretation.

*Id.*

### B.    <u>Products' Labeling</u>

14.    **Challenged Representations on Products' Labels.** Defendant uniformly and prominently labels and packages the Products with the Challenged Representations. An example of the Dosage Representation, encircled in red ("1280 mg OMEGA-3"), and the Unit Representation, also encircled in red ("60 SOFT GELS"), are depicted below. *See also* **Exhibit 1** [Product Labels]. Together the Challenged Representations convey to reasonable consumers that the Product contains the advertised amount of nutrients in the Dosage Representation in each tablet, capsule, or gummy unit advertised in the Unit Representation (e.g., "60 SOFT GELS" each of which contains "1280 mg OMEGA-3"). However, in order to receive the advertised amount of nutrients in the Dosage Representation (e.g., "1280 mg Omega-3"), a consumer must take two or more tablets, capsules, or gummy units, also encircled in red (e.g., "Two soft gels"). This means that the consumer is receiving half or less than the advertised amount of nutrients per Product. *See also* **Exhibit 3** [Serving Size Chart]):




*See*, *e.g.*, **Exhibit 1-64** [Ultimate Omega; Soft Gels—Lemon Flavor]

15.     The Challenged Representations on the Products' packaging are prominently and conspicuously displayed to grab the consumer's attention.

a.   **Primary Purpose and Quantity.** The Challenged Representations specifically and primarily regard the principal purpose of the Products. The Dosage and Unit Representations convey the type and amount of nutrients the vitamin or dietary supplement principally provides. The provision of nutrients is the sole reason for any consumer to buy the Products.

b.   **Placement.** The Challenged Representations are prominently placed on the center of each Products' primary display panel of the front label or packaging. *See* **Exhibit 1** [Product Images].

c.   **Sparsity of Competing Subsidiary Information.** The Challenged Representations are not hidden in a sea of information; rather, the front display panels contain scant competing information about the Products, largely limited to the brand name (Nordic Naturals®), identity of the product line (e.g., Ultimate Omega, Children's and Complete), the primary purpose and quantity of the Products (e.g., the Challenged Representations), and some subsidiary or tangential benefits (e.g., absorption, flavor). *See* **Exhibit 1** [Product Images].

d.   **Typeface.** The Challenged Representations stand out from the scant information contained on the front panel, prominently displayed with a bold and large typeface, clear and legible font, and highly visible lettering that starkly contrast with the Products' background. *See* **Exhibit 1** [Product Images].

In this way, Defendant conveyed the Products' primary purpose to provide nutrients in the deceptively advertised quantities vis a vis the Challenged Representations, and carefully designed the Products' labels and packaging, including the Challenged Representations' placement and typeface, alongside the dearth of competing information, to perpetuate the false notion that the Products contain the advertised amount of nutrients per tablet, capsule, or gummy unit. The net-effect or net-impression on consumers viewing the Products' labels or packaging is that the Products contain two or more times the amount of nutrients than the Products actually contain.

> **C.    <u>Falsity of the Challenged Representations</u>**

16.    **Falsity of the Challenged Representations.** As discussed above, the Challenged Representations reasonably convey to consumers that each tablet, capsule or gummy in the Products contains the advertised dosage. However, contrary to the Challenged Representations, the Products only contain a fraction of the advertised nutrients. *See* **Exhibit 3** [Serving Size Chart]. Specifically:

a.   (1) Nordic Naturals *Algae*, in all size variations, flavors or packing types, including:

   1.   Algae DHA, in all sizes, including (a) 60 Count and (b) 90 Count (*see* **Exhibit 1-1 to Exhibit 1-2**) requires taking <u>two units</u> to receive 500 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;
   2.   Algae Omega, in all sizes, including (a) 60 Count, (b) 90 Count, and (c) 120 Count (*see* **Exhibit 1-3 to Exhibit 1-5**) requires taking <u>two units</u> to receive 500 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

   (*see* **Exhibit 1-1** to **1-5** [Product Images Nordic Naturals *Algae* Vitamins and Dietary Supplements]; *see also see also* **Exhibit 3** [Serving Size Chart]);

b.   (2) Nordic Naturals *Children's*, in all size variations, flavors, or packing types, including:

   3.   Children's DHA, in all sizes, including (a) 90 Count, (b) 120 Count, (c) 180 Count, and (d) 360 Count (*see* **Exhibit 1-6** to **Exhibit 1-9**) requires taking <u>four units</u> to receive 250 mg Omega-3, resulting in consumers receiving only one-fourth the amount of nutrients advertised in the Challenged Representations;
   4.   Children's DHA Vegetarian, in all sizes, including (a) 120 Count (*see* **Exhibit 1-10**) requires taking <u>three units</u> to receive 375 mg Omega-3,

resulting in consumers only receiving one-third the amount of nutrients advertised in the Challenged Representations;

5.  Children's DHA Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-11**) requires taking <u>three units</u> to receive 636 mg Omega-3, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-6** to **1-11** [Product Images Nordic Naturals *Children's* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

c.  (3) Nordic Naturals *Complete*, in all size variations, flavors, or packaging types, including:

6.  Complete Omega, in all sizes, including (a) 60 Count, (b) 120 Count, and (c) 180 Count (*see* **Exhibit 1-12** to **Exhibit 1-14**) requires taking <u>two units</u> to receive 565 mg Omega-3 and 70- mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

7.  Complete Omega Junior, in all sizes, including (a) 90 Count and (b) 180 Count (*see* **Exhibit 1-15** to **Exhibit 1-16**) requires taking <u>two units</u> to receive 283 mg Omega-3 and 35 mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

8.  Complete Omega Xtra, in all sizes, including (a) 60 Count (*see* **Exhibit 1-17**) requires taking <u>two units</u> to receive 1360 mg Omega-3 and 76 mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

9.  Complete Omega-D3, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-18** to **Exhibit 1-19**) requires taking <u>two units</u> to receive 565 mg Omega-3, 70 mg GLA, and 1000 IU[6] D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

10.  Complete Omega-D3 Junior, in all sizes, including (a) 90 Count (*see* **Exhibit 1-20**) requires taking <u>two units</u> to receive 283 mg Omega-3, 15 mg GLA, and 1000 IU D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-12** to **1-20** [Product Images Nordic Naturals *Complete* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

d.  (4) Nordic Naturals *Nordic Flora Probiotic*, in all size variations, flavors, or packaging types, including:

11.  Kids Nordic Flora Probiotic Gummies with Prebiotics, in all sizes, including (a) 60 Count (*see* **Exhibit 1-21**) requires taking <u>two units</u> to

---

[6] IU stands for "International Unit," which is "a measurement of the biological effects that a biologically active substance will have" on the human body. *See* Uscriptives, *What Does IU Mean on Vitamin Labels?* (Aug. 27, 2021), https://uscriptives.com/blogs/what-does-iu-mean-on-vitamin-labels/.

receive 1.5 billion CFU[7], resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

12. Nordic Flora Probiotic Daily, in all sizes, including (a) 60 Count (*see* **Exhibit 1-22**) requires taking <u>two units</u> to receive 12 billion CFU, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

13. Nordic Flora Probiotic Woman, in all sizes, including (a) 60 Count (*see* **Exhibit 1-23**) requires taking <u>two units</u> to receive 15 billion CFU, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-21** to **1-23** [Product Images for Nordic Naturals *Nordic Flora* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

e. (5) Nordic Naturals *Omega-3*, in all size variations, flavors, or packaging types, including:

14. Artic Cod Liver Oil, in all sizes, including (a) 90 Count and (b) 180 Count (*see* **Exhibit 1-24** to **Exhibit 1-25**) requires taking <u>three units</u> to receive 750 mg Omega-3, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

15. Arctic Omega, in all sizes, including (a) 180 Count (*see* **Exhibit 1-26**) requires taking <u>two units</u> to receive 330 mg EPA and 220 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

16. Balanced Omega, in all sizes, including (a) 180 Count (*see* **Exhibit 1-27**) requires taking <u>two units</u> to receive 240 mg EPA, 160 mg DHA, and 76 mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

17. Curcumin Gummies, in all sizes, including (a) 60 Count (*see* **Exhibit 1-28**) requires taking <u>two units</u> to receive 200 mg Longvida Optimized Curcumin, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

18. DHA, in all sizes, including (a) 90 Count (*see* **Exhibit 1-29**) requires taking <u>two units</u> to receive 830 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

19. DHA Jr. Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-30**) requires taking <u>three units</u> to receive 165 mg EPA and 375 mg DHA, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

20. DHA Junior, in all sizes, including (a) 180 Count (*see* **Exhibit 1-31**) requires taking <u>four units</u> to receive 80 mg EPA and 120 mg DHA, resulting in consumers receiving only one-quarter the amount of nutrients advertised in the Challenged Representations;

21. DHA Xtra, in all sizes, including (a) 60 Count and (b) 90 Count (*see* **Exhibit 1-32** to **Exhibit 1-33**) requires taking <u>two units</u> to receive 1660

---

[7] CFU stands for "colony forming units," which is used to measure probiotic measurements by vitamin and dietary supplement manufacturers. *See* Gina Jaeger, PhD, *Probiotics: How Many Billion CFU do I Need to Maintain Daily Digestive Health?*, NORDIC NATURALS (Aug. 18, 2021), https://www.nordic.com/healthy-science/probiotics-how-many-billion-cfu-do-i-need-to-maintain-daily-digestive-health/.

mg Omega-3;

22.  EPA, in all sizes, including (a) 60 Count (*see* **Exhibit 1-34**) requires taking <u>two units</u> to receive 1210 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

23.  EPA Xtra, in all sizes, including (a) 60 Count and (b) 90 Count (*see* **Exhibit 1-35** to **Exhibit 1-36**) requires taking <u>two units</u> to receive 1640 mg Omega-3;

24.  Omega Blood Sugar, in all sizes, including (a) 60 Count (*see* **Exhibit 1-37**) requires taking <u>two units</u> to receive 896 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

25.  Omega Curcumin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-38**) requires taking <u>two units</u> to receive 1200 mg Omega-3 and 400 mg Optimized Curcumin, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

26.  Omega Focus, in all sizes, including (a) 60 Count (*see* **Exhibit 1-39**) requires taking <u>two units</u> to receive 1280 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

27.  Omega Joint Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-40**) requires taking <u>three units</u> to receive 1065 mg Omega-3, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

28.  Omega LDL, in all sizes, including (a) 60 Count (*see* **Exhibit 1-41**) requires taking <u>three units</u> to receive 1152 mg Omega-3, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

29.  Omega Memory with Curcumin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-42**) requires taking <u>two units</u> to receive 1000 mg Omega-3 and 400 mg Optimized Curcumin, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

30.  Omega Vision, in all sizes, including (a) 60 Count (*see* **Exhibit 1-43**) requires taking <u>two units</u> to receive 1460 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

31.  Omega Woman with Evening Primrose Oil, in all sizes, including (a) 120 Count (*see* **Exhibit 1-44**) requires taking <u>two units</u> to receive 500 mg Omega-3 and 76 mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

32.  Omega-3, in all sizes, including (a) 60 Count, (b) 90 Count, (c) 120 Count, and (d) 180 Count (*see* **Exhibit 1-45** to **Exhibit 1-48**) requires taking <u>two units</u> to receive 690 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

33.  Omega-3 Phospholipids, in all sizes, including (a) 60 Count (*see* **Exhibit 1-49**) requires taking <u>two units</u> to receive 500 mg Omega-3 and 350 mg Phospholipids, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

34.  Omega-3D, in all sizes, including (a) 60 Count (*see* **Exhibit 1-50**) requires taking <u>two units</u> to receive 690 mg Omega-3 and 1000 IU D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

35.  Omega-3 Gummies, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-51** to **Exhibit 1-52**) requires taking <u>two units</u> to receive 82 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

36.     Recovery Plus, in all sizes, including (a) 45 Count (*see* **Exhibit 1-53**) requires taking <u>three units</u> to receive 1800 mg Omega-3 and 600 mg Curcumin Extract, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-24** to **Exhibit 1-53** [Product Images for Nordic Naturals *Omega-3* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

f.     (6) Nordic Naturals *Postnatal and Prenatal Care*, in all size variations, flavors, or packaging types, including:

37.     Postnatal Omega-3, in all sizes, including (a) 60 Count (*see* **Exhibit 1-54**) requires taking <u>two units</u> to receive 1120 mg Omega-3 and 1000 IU DC, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

38.     Prenatal DHA, in all sizes, including (a) 90 Count, (b) 120 Count, and (c) 180 Count (*see* **Exhibit 1-55** to **Exhibit 1-58**) requires taking <u>two units</u> to receive 830 mg Omega-3 and 400 IU Vitamin D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

39.     Vegan Prenatal DHA, in all sizes, including (a) 60 Count (*see* **Exhibit 1-59**) requires taking <u>two units</u> to receive 500 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-54** to **Exhibit 1-59** [Product Image for Nordic Naturals *Postnatal and Prenatal Care* Vitamins and Dietary Supplements]); *see also* **Exhibit 3** [Serving Size Chart];

g.     (7) Nordic Naturals *Vitamin C*, in all size variations, flavors, or packaging types, including:

40.     Immune Daily Defense, in all sizes, including (a) 90 Count (*see* **Exhibit 1-60**) requires taking <u>three units</u> to receive 1000 mg Vitamin C, 429 mg Elderberry Extract, 15 mg Zinc, and 2000 IU Vitamin D3, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

41.     Vitamin C Gummies, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-61** to **Exhibit 1-62**) requires taking <u>two units</u> to receive 250 mg Vitamin C, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

42.     Vitamin C Gummies Sports, in all sizes, including (a) 120 Count (*see* **Exhibit 1-63**) requires taking <u>two units</u> to receive 250 mg Vitamin C, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-60** to **Exhibit 1-63** [Product Images for *Vitamin C* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

h. (8) Nordic Naturals *Ultimate*, in all size variations, flavors, or packaging types, including:

43. Ultimate Omega, in all sizes, including (a) 60 Count, (b) 90 Count, (c) 120 Count, (d) 180 Count, and (e) 210 Count (*see* **Exhibit 1-64** to **Exhibit 1-68**) requires taking two units to receive 1280 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

44. Ultimate Omega Gummy Chews, in all sizes, including (a) 54 Count (*see* **Exhibit 1-69**) requires taking two units to receive 1200 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

45. Ultimate Omega + Coq10, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-70** to **Exhibit 1-71**) requires taking two units to receive 1280 mg Omega-3 and 100 mg Coenzyme Q10, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

46. Ultimate Omega in Fish Gelatin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-72**) requires taking two units to receive 1280 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

47. Ultimate Omega Junior, in all sizes, including (a) 90 Count and (b) 120 Count (*see* **Exhibit 1-73** to **Exhibit 1-74**) requires taking two units to receive 680 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

48. Ultimate Omega Sport 2X, in all sizes, including (a) 60 Count (*see* **Exhibit 1-75**) requires taking two units to receive 2150 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

49. Ultimate Omega 2x, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-76** to **Exhibit 1-77**) requires taking two units to receive 2150 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

50. Ultimate Omega 2x Mini, in all sizes, including (a) 60 Count (*see* **Exhibit 1-78**) requires taking two units to receive 1120 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

51. Ultimate Omega 2x Mini with Vitamin D3, in all sizes, including (a) 60 Count (*see* **Exhibit 1-79**) requires taking two units to receive 1120 mg Omega-3 and 1000 IU Vitamin D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

52. Ultimate Omega Xtra, in all sizes, including (a) 60 Count (*see* **Exhibit 1-80**) requires taking two units to receive 1480 mg Omega-3 and 1000 IU Vitamin D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

53. Ultimate Omega-D3, in all sizes, including (a) 60 Count, (b) 90 Count, and (c) 120 Count (*see* **Exhibit 1-81** to **Exhibit 1-83**) requires taking two units to receive 1280 mg Omega-3 and 1000 IU Vitamin D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

54. Ultimate Omega-D3 Sport, in all sizes, including (a) 60 Count (*see* **Exhibit 1-84**) requires taking two units to receive 1480 mg Omega-3 and 1000 IU D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

55. Omega-D3 2x, in all sizes, including (a) 60 Count (*see* **Exhibit 1-85**) requires taking <u>two units</u> to receive 2150 mg Omega-3 and 1000 IU Vitamin D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-64** to **Exhibit 1-85** [Product Images for Nordic Naturals *Ultimate Vitamins* and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

i.  (9) Nordic Naturals *Zero Sugar*, in all size variations, flavors, or packaging types, including:

56. Zero Sugar Curcumin Gummies, in all sizes, including (a) 60 Count (*see* **Exhibit 1-86**) requires taking <u>two units</u> to receive 200 mg Longvida Optimized Curcumin, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations; and

57. Zero Sugar Ultimate Omega Gummy Chews, in all sizes, including (a) 54 Count (*see* **Exhibit 1-87**) requires taking <u>two units</u> to receive 1200 mg Omega-3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations.

(*see* **Exhibit 1-86** to **Exhibit 1-87** [Product Images for Nordic Naturals *Zero Sugar* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

j.  (10) Nordic Naturals *Pro*, in all size variations, flavors, or packaging types, including:

58. ProDHA, in all sizes, including (a) 120 Count (*see* **Exhibit 1-88**) requires taking <u>two units</u> to receive 205 mg EPA and 480 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

59. ProDHA 1000, in all sizes, including (a) 60 Count (*see* **Exhibit 1-89**) requires taking <u>two units</u> to receive 410 mg EPA and 960 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

60. ProDHA Eye, in all sizes, including (a) 60 Count (*see* **Exhibit 1-90**) requires taking <u>two units</u> to receive 360 mg EPA and 845 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

61. ProDHA Focus Jr., in all sizes, including (a) 120 Count (*see* **Exhibit 1-91**) requires taking <u>four units</u> to receive 240 mg EPA and 520 mg DHA, resulting in consumers receiving only one-quarter the amount of nutrients advertised in the Challenged Representations;

62. ProDHA Memory, in all sizes, including (a) 60 Count (*see* **Exhibit 1-92**) requires taking <u>two units</u> to receive 280 mg EPA and 560 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

63. ProEFA-3-6-9, in all sizes, including (a) 90 Count and (b) 180 Count (*see* **Exhibit 1-93** to **Exhibit 1-94**) requires taking <u>two units</u> to receive 270 mg EPA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

64. ProEPA, in all sizes, including (a) 120 Count and (b) 180 Count (*see* **Exhibit 1-95** to **Exhibit 1-96**) requires taking <u>two units</u> to receive 850 mg EPA and 200 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

65. ProEPA with Concentrated GLA, in all sizes, including (a) 60 Count (*see* **Exhibit 1-97**) requires taking <u>two units</u> to receive 850 mg EPA, 220 mg DHA, and 257 mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

66. ProEPA Xtra, in all sizes, including (a) 120 Count (*see* **Exhibit 1-98**) requires taking <u>two units</u> to receive 1060 mg EPA and 260 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

67. ProOmega 2000 Jr., in all sizes, including (a) 60 Count (*see* **Exhibit 1-99**) requires taking <u>two units</u> to receive 586 mg EPA and 456 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

68. ProOmega 2000, in all sizes, including (a) 120 Count (*see* **Exhibit 1-100**) requires taking <u>two units</u> to receive 1125 mg EPA and 875 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

69. ProOmega 2000-D, in all sizes, including (a) 60 Count (*see* **Exhibit 1-101**) requires taking <u>two units</u> to receive 1125 mg EPA, 875 mg DHA, and 1000 mg D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

70. ProOmega Blood Sugar, in all sizes, including (a) 60 Count (*see* **Exhibit 1-102**) requires taking <u>two units</u> to receive 455 mg EPA and 315 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

71. ProOmega CoQ10, in all sizes, including (a) 60 Count and (b) 120 Count (*see* **Exhibit 1-103** to **Exhibit 1-104**) requires taking <u>two units</u> to receive 650 mg EPA, 450 mg DHA, 100 mg CoQ10, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

72. ProOmega CRP, in all sizes, including (a) 90 Count (*see* **Exhibit 1-105**) requires taking <u>three units</u> to receive 735 mg EPA, 525 mg DHA, 600 mg Optimized Curcumin, 300 mg NAC, 225 mg Bioavailable Reduced L-Glutathione, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

73. ProOmega In Fish Gelatin, in all sizes, including (a) 60 Count (*see* **Exhibit 1-106**) requires taking <u>two units</u> to receive 650 mg EPA and 450 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

74. ProOmega Joint Xtra, in all sizes, including (a) 90 Count (*see* **Exhibit 1-107**) requires taking <u>three units</u> to receive 540 mg EPA and 360 mg DHA, resulting in consumers receiving only one-third the amount of nutrients

advertised in the Challenged Representations;

75. ProOmega Junior, in all sizes, including (a) 90 Count (*see* **Exhibit 1-108**) requires taking <u>two units</u> to receive 340 mg EPA and 245 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

76. ProOmega LDL, in all sizes, including (a) 180 Count (*see* **Exhibit 1-109**) requires taking <u>three units</u> to receive 489 mg EPA and 336 mg DHA, resulting in consumers receiving only one-third the amount of nutrients advertised in the Challenged Representations;

77. ProOmega, in all sizes, including (a) 180 Count (*see* **Exhibit 1-110**) requires taking <u>two units</u> to receive 650 mg EPA and 450 mg DHA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

78. ProOmega-3-6-9, in all sizes, including (a) 120 Count (*see* **Exhibit 1-111**) requires taking <u>two units</u> to receive 780 mg EPA, 390 mg DHA, and 76 mg GLA, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations; and

79. ProOmega-D, in all sizes, including (a) 60 Count and (b) 180 Count (*see* **Exhibit 1-112** to **Exhibit 1-113**) requires taking <u>two units</u> to receive 650 mg EPA, 450 mg DHA, and 1000 mg D3, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-88** to **Exhibit 1-113** [Product Images for Nordic Naturals *Pro* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]);

k.  (11) Nordic Naturals *Magnesium*, in all size variations, flavors, or packaging types, including:

80. Magnesium Complex, in all sizes, including (a) 90 Count (*see* **Exhibit 1-114**) requires taking <u>three units</u> to receive 225 mg Magnesium, resulting in consumers receiving only half the amount of nutrients advertised in the Challenged Representations; and

81. Magnesium Gummies, in all sizes, including (a) 60 Count (*see* **Exhibit 1-115**) requires taking <u>three units</u> to receive 300 mg Magnesium, resulting in consumer receiving only one-third the amount of nutrients advertised in the Challenged Representations;

(*see* **Exhibit 1-114** to **Exhibit 1-115** [Product Images for Nordic Naturals *Magnesium* Vitamins and Dietary Supplements]; *see also* **Exhibit 3** [Serving Size Chart]).

**D.    Defendant's Brand Strategy and Long-Standing Marketing Campaign**

17.    **Brand Strategy/Marketing Campaign.** Defendant strategically and deliberately markets itself as an honest and transparent manufacturer of vitamins and supplements to convince

consumers that the Products live up to their labels and deliver the nutrients promised. For example, Defendant maintains a website dedicated to the marketing of the Products at www.Nordic.com. On Defendant's website, Defendant claims that it "tested to verify potency, purity, and freshness" of its Products through "certified laboratories" to convince consumers that the Products live up to their labels. **Exhibit 4** [The Nordic Promise]. Defendant also claims each Product has "[a]ctive ingredient amounts that *always* match their values on the label." *Id.* (emphasis added). Defendant also repeatedly claims that it is committed to transparency. *See id*.

     E.    <u>Competitor Vitamin and Dietary Supplement Product Labels and Packaging</u>

    18.    **Competitor Products.** Defendant's competitors label their vitamin and dietary supplement products to accurately reflect the correct amount of nutrients contained in each tablet, capsule, or gummy. *See* **Exhibit 2** [Comparison Product Images]. They do so by specifying on the front label and packaging the amount of nutrients per tablet, capsule, or gummy unit (Competitor Image No. 1) or by specifying the number of servings that contain the amount of nutrients advertised on the front label and packaging (Competitor Image No. 2 below).

    **Competitor Image No. 1:**



**Competitor Image No. 2:**



19.      **Competitor Image No. 1.** In Competitor Image No. 1, the dietary supplement's front label accurately describes the amount of nutrients—specifically, "1200 mg" of "Fish Oil", "360 mg of Omega-3," and "1000 IU of Vitamin D₃"—in each of the "90 Rapid Release Softgels," which is consistent with the Supplement Facts on the back label ("Serving Size 1 Softgel," which contains the following "Amount[s] Per Serving": "Vitamin D . . . 1,000 IU"; "Fish Oil 1,200 mg"; and "360 mg of Total Omega-3"). In this way, the front label accurately and unambiguously identifies the amount of nutrients the dietary supplement provides per soft gel capsule.

20.      **Competitor Image No. 2.** In Competitor Image No. 2, the dietary supplement's front label and packaging accurately describes the amount of nutrients—"1000 MG" of "ANTARCTIC KRILL OIL"—in each of the "30 SERVINGS," which is consistent with the Supplement Facts on the packaging's side-panel (specifying: "Serving Size 2 Softgels," for a

total of "30" "Servings Per Container," each of which contains "1000 mg" of "Antarctic Krill Oil"). In this way, the front label and packaging clearly represents the amount of nutrients that each soft gel capsule contains to avoid deceiving consumers into believing that they are receiving twice the amount of nutrients than what is actually contained in the product.

### F.   Defendant Knowingly and Deliberately Misleads Plaintiff and Reasonable Consumers into Buying the Products to Their Detriment

21.    **Products.** Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Products, which all display the Challenged Representations on their front-facing labels and packaging. However, to obtain the amount of nutrients promised by the Dosage Representation, a consumer would need to ingest two or more tablets, capsules, or gummy units. *See*, *supra*, ¶ 4 (identifying Products); *see also* **Exhibit 1** [Product Images], **Exhibit 3** [Serving Size Chart].

22.    **The Challenged Representations.** On the Products' front-facing labels and packaging, Defendant prominently, conspicuously, and unambiguously displays the Challenged Representations—specifically, the Unit and Dosage Representations. *See* **Exhibit 1** [Product Images]. Defendant also reinforces the Challenged Representations through its advertising campaign and brand strategy to differentiate the Products from its competitors and convince consumers that its Products are accurately, truthfully, and transparently labeled and packaged to provide the nutrients claimed in the Challenged Representations. *See* **Exhibit 4** [The Nordic Promise].

23.    **Reasonable Consumer's Perception.** The Challenged Representations, in isolation or combined with Defendant's marketing campaign and brand strategy, lead reasonable consumers, like Plaintiff, into believing that the Products conform to the Challenged Representations. More specifically, reasonable consumers interpret the Challenged Representations to mean that each tablet, capsule, or gummy advertised by the Unit Representation contains the amount of nutrients advertised by the Dosage Representation.

24.    **Materiality.** The Challenged Representations are material to reasonable consumers, including Plaintiff, in deciding to buy the Products. The primary purpose of the

Products is to provide the amount of nutrients advertised by the Challenged Representations.

25.    **Reliance.** The Class, including Plaintiff, reasonably rely on the Challenged Representations in deciding to purchase the Products, as the Dosage and Unit Representations are not only material to consumers, but they are prominently and uniformly displayed on the front-facing labels and packaging of each Product, such that each and every consumer who buys the Products are exposed to them. *See* **Exhibit 1** [Product Images].

26.    **Falsity.** The Challenged Representations are false and deceptive because each tablet, capsule, or gummy unit does not contain the advertised dosage. Instead, each such unit contains only a fraction of the advertised amount of nutrients, as detailed above and reflected in **Exhibit 3**.

27.    **Consumers Lack Knowledge of Falsity.** Consumers, including Plaintiff, do not know, and have no reason to know, at the time of purchase, that the Products' Challenged Representations are false, misleading, deceptive, and unlawful. That is because reasonable consumers, like Plaintiff, do not ordinarily review information that appears outside the front-facing labels and packaging (e.g., the back or side panels) of a consumer product's packaging, including nutritional or supplement facts. Indeed, published research regarding consumer behavior shows, exactly what Defendant and other manufacturers trade upon, that few consumers, if any at all, actually review information that is displayed on side, back, or bottom panels of the labels and packaging of consumer goods, or otherwise buried in particularly dense, fine-print ingredient disclosures. In fact, several peer-reviewed journals have published studies, described below, that show as little as approximately 7.7% to 11.6% of people even look at side or back labels, and only about 3.7% look at the side or back labels in detail, before purchasing products products.[8] Indeed,

---

[8] Klaus Grunert, et. al, *Nutrition knowledge, and use and understanding of nutrition information on food labels among consumers in the UK*, 55 Appetite 177, at 179-181 (2010) available at https://reader.elsevier.com/reader/sd/pii/S0195666310003661?token=95E4146C1BB7D7A7C9A 487F22F0B445BD44499550086E04870765EBE116ED32DBFE3795E60B69C75831563CD1B C6655A&originRegion=us-east-1&originCreation=20220720162546 (last accessed May 30, 2023) (consumer purchasing behavior study using in-store observation and interview data collection methodology to realistically estimate the degree consumers use nutritional information (found on side/back panels of food product labels and packaging), finding: (1) only **11.6% of respondents**, who looked at a product and placed it in their shopping cart, **were actually observed looking at the side/back panels of its packaging or labels** (panels other than the front panel)

as little as 4.17% of people looked at the nutrition information. *Id.*

28.    **Defendant's Knowledge.** Defendant knew, or should have known, that the Challenged Representations were false, misleading, deceptive, and unlawful, at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Products to Plaintiff and the Class. Defendant intentionally and deliberately used the Challenged Representations to cause Plaintiff and similarly situated consumers to buy or overpay for the Products, believing that the Challenged Representations are true.

   a.    **Knowledge of Falsity.** Defendant marketed the Products with the Challenged Representations, but Defendant opted to formulate and manufacture them in a manner that does not conform to those representations. Specifically, Defendant advertised each tablet, capsule, or gummy unit in the Unit Representation as having the amount of nutrients advertised in the Dosage Representation. Contrary to the Challenged Representations, each tablet, capsule, or gummy unit advertised in the Unit Representation has half or less the amount of nutrients advertised in the Dosage Representation.

   b.    **Knowledge of Reasonable Consumers' Perception.** Defendant knew, or should have known, that the Challenged Representations would lead reasonable consumers into believing that each tablet, capsule, or gummy unit advertised in the Unit Representation contains the amount of nutrients advertised in the Dosage Representation. Not only has Defendant labeled and packaged each of the Products with the Challenged Representations, but Defendant also has an obligation under section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. §§ 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Defendant was

---

before placing it in the cart; (2) of those who looked at the side/back panels, only 31.8% looked at it the product "in detail" (i.e., **3.7% of respondents who looked at the product, looked at side/back panels in detail**)); and (3) the **respondents self-reported frequency of reviewing side/back panels** (for nutritional information) **is overreported by 50%** when the in-store interview data and observational data are compared); Klaus Grunert, et. al, *Use and understanding of nutrition information on food labels in six European countries*, 18(3) Journal of Public Health 261, 261, 263, 266 (2010), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967247/ (last accessed May 30, 2023) (consumer purchasing behavior study using in-store observation and interview data collection methodology to evaluate whether people look at food labels before buying them, where they looked, and how long they looked, finding: (1) respondents spent, on average, approximately 35 seconds, per product, on products they bought; and (2) 62.6% of respondents looked at the front packaging, and **only 7.7% looked elsewhere (side/back panels) on the packaging**, for products they bought); Yael Benn, et al., *What information do consumers consider and how do they look for it, when shopping for groceries online*, 89 Appetite 265, 265, 270 (2015), available at https://www.sciencedirect.com/science/article/pii/S0195666315000422#bib0060 (last accessed May 30, 2023) (consumer purchasing behavior study using online eye-movement tracking and recordation, finding: (1) once on the product webpages, respondents tend to look at the pictures of products, rather than examine detailed product information; and (2) by comparison to pictures of products where 13.83-19.07% of respondents fixated, far less fixated on subsidiary information: **4.17% of respondents looked at nutrition information**, 3.30% ingredients, 2.97% allergy information, and 0.09% recycling information for example).

statutorily obligated to consider whether the Challenged Representations would mislead reasonable consumers into believing that each tablet, capsule, or gummy unit advertised in the Unit Representation contains the amount of nutrients advertised in the Dosage Representation. Thus, Defendant either knew the Challenged Representations are misleading before it marketed the Products to the Class, including Plaintiff, or Defendant would have known that it is deceptive had it complied with its statutory obligations.

c.    **Knowledge of Materiality.** Defendant knew or should have known that the Challenged Representations are material to consumers. *First*, manufacturers and marketers, like Defendant, generally reserve the front primary display panel of labels of packaging on consumer products for the most important and persuasive information, which they believe will motivate consumers to buy the products. Here, the conspicuousness of the Challenged Representations on the Products' labels and packaging demonstrates Defendant's awareness of its importance to consumers and Defendant's understanding that consumers prefer and are motivated to buy products that conform to the Challenged Representations. *See* **Exhibit 1** [Product Images]. ***Second***, the primary purpose of the Products and only reason to buy the Products is for consumers to obtain the amount of nutrients advertised in the Challenged Representations. That is the principal and singular purpose of the Products. ***Third***, several of Defendant's competitors truthfully and accurately label their vitamins and dietary supplements in a manner that is easily understandable to the reasonable consumer and avoids the very deception described herein. *See* **Exhibit 2** [Comparison Products].

d.    **Defendant's Continued Deception, Despite Its Knowledge.** Defendant, as the manufacturer and marketer of the Products, had exclusive control over the Challenged Representations' inclusion on the Products' labels, packaging, and advertisements—i.e., Defendant readily and easily could have stopped using the Challenged Representations to sell the Products. However, despite Defendant's knowledge of the Challenged Representations falsity, and Defendant's knowledge that consumers reasonably rely on the Challenged Representations in deciding to buy the Products, Defendant deliberately chose to market the Products with the Challenged Representations thereby misleading consumers into buying or overpaying for the Products. Thus, Defendant knew, or should have known, at all relevant times, that the Challenged Representations mislead reasonable consumers, such as Plaintiff and the Class, into buying the Products to attain the product-attributes that Defendant falsely advertised and warranted. Indeed, notwithstanding a demand to Defendant to stop misleading consumers with the Challenged Representations, served more than one year prior to the filing of this action, Defendant has continued to deceptively market the Products using the Challenged Representations. *See* **Exhibit 5** [1st Pre-Litigation Demand].

29.    **Detriment.**  Plaintiff and similarly situated consumers would not have purchased the Products or would not have overpaid for them, if they had known that the Challenged Representations were false and, therefore, the Products do not have the attribute claimed, promised, warranted, advertised, and/or represented in the Challenged Representations. Accordingly, based on Defendant's material misrepresentations and omissions, reasonable consumers, including Plaintiff and the Class, purchased the Products to their detriment.

### G.    The Products' Substantial Similarity

30.    As described herein, Plaintiff bought the products identified above (collectively, the "**Purchased Products**"). The additional Products (collectively, the "**Unpurchased Products**") are substantially similar to the Purchased Products.

    a.    **Defendant.** All Products are manufactured, sold, marketed, advertised, labeled, and packaged by Defendant.

    b.    **Brand.** All Products are sold under the same brand name: Nordic Naturals®.

    c.    **Purpose.** All Products are vitamins and dietary supplements intended for human consumption.

    d.    **Marketing Demographics.** All Products are marketed directly to consumers for personal consumption, primarily intended to provide nutrients and otherwise supplement the individual's diet and/or improve the individual's health and wellbeing.

    e.    **Challenged Misrepresentations.** All Products contain the same Challenged Representations (the Dosage Representation and Unit Representation) conspicuously and prominently placed on the primary display panel of the front labels and packaging. *See* **Exhibit 1** [Product Images]. The Challenged Representations reasonably convey that each tablet, capsule, or gummy unit advertised in the Unit Representation contains the amount of nutrients advertised in the Dosage Representation.

    f.    **Labels and Packaging.** All Products are packaged in similar packaging— using a largely mono-color background, and similar styles for written content. *See* **Exhibit 1** [Product Images]. The Products' front packaging and labels largely share, in common, the same marketing claims, including brand identity (Nordic Naturals®), identity of the product line (e.g., Children's or Ultimate), the identity and quantity of the nutrients (Dosage Representation), the number of tablets, capsules, and/or gummy units (Unit Representation), and some subsidiary benefits (e.g., flavor, absorption).

    g.    **Falsity.** The Challenged Representations on each Product are false because each tablet, capsule, or gummy unit advertised in the Unit Representation does not contain the amount of nutrients advertised in the Dosage Representation. Rather, the Products contain half or less the amount of nutrients advertised in the Challenged Representations, depending on the serving size—i.e., two, three, and four units per serving mean that consumers receive half, one-third, and one-fourth the amount of nutrients advertised in the Challenged Representations, respectively. *See* **Exhibit 3**.

    h.    **Misleading Effect.** The misleading effect of the Challenged Representations on consumers is the same for all Products—consumers receive half or less the amount of nutrients promised and therefore pay two or more times than what the Products would be worth had the Challenged Representations been true.

/ / /

/ / /

## VI.    CLASS ACTION ALLEGATIONS

31.    **Class Definition.** Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and all others similarly situated, and as members of the Classes defined as follow:

> All residents of the State of New York who, within the applicable statute of limitations periods, purchased the Products for purposes other than resale ("the **Class**").

32.    **Class Definition Exclusions.**  Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

33.    **Reservation of Rights to Amend the Class Definition.**  Plaintiff reserves the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

34.    **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of thousands of purchasers (if not more) dispersed throughout the State of New York. Accordingly, it would be impracticable to join all members of the Class before the Court.

35.    **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

> a.    Whether Defendant engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;
>
> b.    Whether Defendant's conduct is unlawful under New York General Business Law section 349, *et seq*.;
>
> c.    Whether Defendant's conduct is unlawful under New York General Business Law section 350, *et seq*.;
>
> d.    Whether Plaintiff and the Class paid more money for the Products than they are worth had the Challenged Representations been true;

   e.  How much more money Plaintiff and the Class paid for the Products than they are worth had the Challenged Representations been true; and

  36. **Typicality:** Plaintiff's claims are typical of the claims of the Class Members he seeks to represent because Plaintiff, like the Class Members, purchased Defendant's misleading and deceptive Products. Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

  37. **Adequacy:** Plaintiff is an adequate representative of the Class he seeks to represent because his interests do not conflict with the interests of the Class Members that Plaintiff seeks to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

  38. **Superiority and Substantial Benefit:** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

   a.  The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

   b.  Absent a Class, the members of the Class will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

   c.  Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

   d.  When the liability of Defendant has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

   e.  This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff

and Class Members can seek redress for the harm caused to them by Defendant.

39.     **Inconsistent Rulings.** Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

40.     **Manageability.** Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.     CAUSES OF ACTION

### COUNT ONE

### Violation of New York's Gen. Bus. Law § 349

### (*On Behalf of the Class*)

41.     **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in the complaint, as though fully set forth herein.

42.     **The Class.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products.

43.     **Deceptive Trade Practices Act.** New York Gen. Bus. Law, section 349, *et seq.* prohibits the "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state."

44.     **Defendant's Deceptive Acts.** Defendant, in its advertising and packaging of the Products, made false, misleading, and deceptive representations and/or omissions about the Products to mislead consumers into believing that each unit of the Products contained the advertised dosage, not only a portion thereof.

45.     **Defendant's Deceptive Actions Cause Purchase of Products.** Defendant's labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff, believing that each unit of the Products contained the advertised dosage, not only a portion thereof.

46.     **Deceptive & Material Challenged Representations.** The Challenged Representations are likely to deceive consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer. Defendant knew consumers would purchase the Products and/or pay more for them under the false belief that each unit of the Products contained the advertised dosage, when they do not. By advertising so prominently that the Products contain certain dosages and units, Defendant has demonstrated that the Challenged Representations are material to consumers. As a result of their deceptive acts and practices, Defendant has sold thousands or tens of thousands (or more) of the Products to unsuspecting consumers across New York. If Defendant had advertised its Products truthfully and in a non-misleading fashion, Plaintiff and the Class Members, would not have purchased the Products or would not have paid as much.

47.     **Reasonable and Detrimental Reliance.** Plaintiff and the Class reasonably and detrimentally relied on the material and false Challenged Representations to their detriment in that they purchased the Products.

48.     **Injury in Fact.** Plaintiff and the Class have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendant's deceptive advertising—namely Plaintiff and the Class lost the entire or a portion of the purchase price for the Products they bought from the Defendant.

49.     **Standing.** Plaintiff has standing to pursue this claim because Plaintiff has suffered an injury-in-fact and has lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff purchased the Products for his own personal use.  In doing so, Plaintiff relied upon Defendant's false, misleading, and deceptive representations that the Products were, and are, providing the advertised dosage per unit, when they were, and are, not. Plaintiff spent money in the transaction that they otherwise would not have spent had they known the truth about the Challenged Representations.

50.     **Causation/Damages.** As a direct and proximate result of Defendant's false, misleading, and deceptive representations and/or omissions, Plaintiff and the Class were harmed in that they: (1) paid money for the Products that were not what Defendant represented; (2) were

deprived of the benefit of the bargain because the Products they purchased were different than what Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about the purported dosage per unit of the Products were truthful. Accordingly, Plaintiff seeks to enjoin Defendant's unlawful acts and practices and to recover their actual damages or fifty (50) dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

51. **Punitive Damages.** Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

### COUNT TWO

### Violation of New York's Gen. Bus. Law § 350

### (*On Behalf of the Class*)

52. **Incorporation by Reference.** Plaintiff re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

53. **The Class.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products.

54.     **False Advertising Standard.** The New York False Advertising Law, codified at Gen. Bus. Law section 350, *et seq.*, prohibits advertising, including labeling, that "is misleading in a material respect."

55.     **False & Material Challenged Representations Disseminated to Public.** Defendant violated section 350 when it advertised and marketed the Products through the unfair, deceptive, untrue, and misleading Challenged Representations, disseminated to the public through the Products' labeling, packaging, and advertising.  These representations were false because the Products do not conform to them.  The representations were material because they are likely to mislead a reasonable consumer into purchasing the Products.

56.     **Knowledge.** In making and disseminating the Challenged Representations alleged herein, Defendant knew or should have known that the representations were untrue or misleading.

57.     **Intent to Sell.** Defendant specifically designed the Challenged Representations to induce reasonable consumers, like Plaintiff and the Class, to purchase the Products.

58.     **Standing.** Plaintiff has standing to pursue this claim because Plaintiff has suffered an injury-in-fact and have lost money or property as a result of Defendant's deceptive acts and practices. Specifically, Plaintiff purchased the Products for their own personal use.  In doing so, Plaintiff relied upon Defendant's false, misleading, and deceptive representations that the Products were, and are, providing the advertised dosage per each unit, when they were, and are, not.  Plaintiff spent money in the transaction that they otherwise would not have spent had they known the truth about the Challenged Representations.

59.     **Causation/Damages.** As a direct and proximate result of Defendant's misconduct, Plaintiff and the Class were harmed in that they: (1) paid money for the Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products they purchased were different than what Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about the purported dosage per unit of the Products were truthful. Accordingly, on behalf of Plaintiff and the Members of the Class, Plaintiff seeks to enjoin Defendant's unlawful acts and practices and to recover their actual damages or five hundred (500) dollars per violation,

whichever is greater, three times actual damages, and reasonable attorneys' fees.

60.    **Punitive Damages.** Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law.  Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving.  Defendant willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff.  Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct.  Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights.  Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers.  The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## COUNT THREE

### Breach of Warranty

#### (*On Behalf of the Class*)

61.    **Incorporation by Reference.** Plaintiff re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

62.    **The Class.** Plaintiff brings this claim individually and on behalf of the Class who purchased the Products.

63.    **Express Warranty.** By advertising and selling the Products at issue, Defendant made promises and affirmations of fact on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiff and members of the Class and Defendant. Defendant purports, through the Products' labeling and advertising, to

create express warranties that the Products, among other things, conform to the Challenged Representations.

64.     **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Defendant, merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiff and members of the Class and Defendant—to wit, that the Products, among other things, conform to the Challenged Representations.

65.     **Breach of Warranties.** Contrary to Defendant's warranties, the Products do not conform to the Challenged Representations and, therefore, Defendant breached its warranties about the Products and their qualities.

66.     **UCC 2-607 – Prelitigation Notice.** Pursuant to N.Y. U.C.C. § 2-607, prior to the filing of this complaint, Plaintiff's counsel, acting on behalf of all consumers who purchased the Products, sent Defendant a notice letter via registered certified mail, return receipt requested, on August 9, 2022 (the "**First Notice Letter**") and on December 7, 2023 (the "**Second Notice Letter**") (collectively, the "**Notice Letters**"). *See* **Exhibits 5, 6**. The Notice Letters were delivered to Defendant's Principal Place of Business and to Defendant's Registered Agent for Service of Process, at the addresses set forth therein, at least thirty (30) days prior to the filing of this complaint. *See*, *e.g.*, **Exhibit 6** (United States Postal Service tracking history and/or signed return receipt indicating delivery of Second Notice Letter on December 11, 2023). The Notice Letters advised Defendant of its breaches of warranties, as outlined herein, and demanded that Defendant rectify said breaches. *See* **Exhibit 5, 6**. As of the filing of this complaint, Defendant has failed to adequately rectify its breaches of warranty. The form, content, and delivery of the Notice Letters complied with all applicable law, including N.Y. U.C.C. § 2-607.

67.     **Causation/Remedies.** As a direct and proximate result of Defendant's breach of warranties, Plaintiff and the Class were harmed in that they: (1) paid money for Products that

were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Products purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Challenged Representations about the Products were truthful. Had Defendant not breached its warranties by making the false representations alleged herein, Plaintiff and the Class would not have purchased the Products or would not have paid as much as they did for them.

68. **Punitive Damages**. Plaintiff seeks punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiff and the Class. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## **PRAYER FOR RELIEF**

69. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendant as follows:

       a. **Certification:** For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel;

       b. **Declaratory Relief:** For an order declaring that Defendant's conduct

violates the statutes and laws referenced herein, consistent with applicable law and pursuant to only those causes of action so permitted;

c.  **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

d.  **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with permissible law and pursuant to only those causes of action so permitted;

e.  **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f.  **Pre/Post Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

g.  **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

Dated: January 19, 2024

**CLARKSON LAW FIRM**

  _/s/ Ryan J. Clarkson_
Ryan J. Clarkson (SBN 5786967)
Timothy K. Giordano (SBN 4091260)
Katherine A. Bruce (*pro hac vice* pending)
Samuel M. Gagnon (SBN 6060735)
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070
Email: rclarkson@clarksonlawfirm.com
        tgiordano@clarksonlawfirm.com
        kbruce@clarksonlawfirm.com
        sgagnon@clarksonlawfirm.com

**MOON LAW, A.P.C.**
Christopher D. Moon (*pro hac vice* pending)
Kevin O. Moon (*pro hac vice* pending)
228 Hamilton Ave., 3rd Fl.
Palo Alto, CA 94301
Tel: (619) 915-9432
Email: chris@moonlawapc.com
        kevin@moonlawapc.com

*Attorneys for Plaintiff*

FIRST AMENDED CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues and causes of action so triable.

Dated: January 19, 2024

**CLARKSON LAW FIRM**

  */s/ Ryan J. Clarkson*
Ryan J. Clarkson (SBN 5786967)
Timothy K. Giordano (SBN 4091260)
Katherine A. Bruce (*pro hac vice* pending)
Samuel M. Gagnon (SBN 6060735)
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070
Email: rclarkson@clarksonlawfirm.com
      tgiordano@clarksonlawfirm.com
      kbruce@clarksonlawfirm.com
      sgagnon@clarksonlawfirm.com


**MOON LAW, A.P.C.**
Christopher D. Moon (*pro hac vice* pending)
Kevin O. Moon (*pro hac vice* pending)
228 Hamilton Ave., 3rd Fl.
Palo Alto, CA 94301
Tel: (619) 915-9432
Email: chris@moonlawapc.com
      kevin@moonlawapc.com


*Attorneys for Plaintiff*